Melissa CHENAULT, Individually and as Sole Managing Conservator and Next Friend of Adeline Mary Huie, Appellants,

v.

Molly Ann HUIE, Appellee.

No. 05–96–00279–CV.

Court of Appeals of Texas, Dallas.

April 15, 1999.

John Howie, Howie & Sweeney, L.L.P., Dallas, for Appellants.

James M. Stewart, Joann N. Wilkins, Burford & Ryburn, L.L.P., Dallas, for Appellee.

Before Justices KINKEADE, MORRIS, and ROACH.[1]

## OPINION

JOSEPH B. MORRIS, Justice.

In this case of first impression, we address the question of whether a woman may be held civilly liable for conduct engaged in while pregnant that causes injury to her later born child. After examining existing law, we conclude that Texas does not recognize a cause of action in tort for injuries to a child that result from the mother's negligent or grossly negligent conduct while she was pregnant with the child. Moreover, after considering the various public policy issues raised by this question, we also conclude that we should not judicially create a legal duty that would have the effect of dictating a pregnant woman's conduct toward her unborn child. Therefore, we affirm the trial

---

1. Justice John Roach succeeds Justice Deborah G. Hankinson, a member of the original panel. Justice Roach has reviewed the briefs and the record in this case.

court's summary judgment in favor of Molly Ann Huie.

## FACTUAL BACKGROUND

The facts of this case are largely undisputed. On October 8, 1993, Molly Ann Huie gave birth to a girl. Throughout the course of her pregnancy, Huie used illegal narcotics, including cocaine. Following the birth, the child was found to have both cocaine and alcohol in her blood. The child has since demonstrated developmental problems and has been diagnosed as having cerebral palsy attributed to Huie's drug use.

Huie's sister, Melissa Chenault, was appointed a sole managing conservator of the child. Chenault filed this suit against Huie and the father alleging that Huie's and the father's negligent and grossly negligent conduct proximately caused the child to suffer severe injuries. Chenault sought damages for past and future medical care, special education, physical and occupational therapy, loss of earning capacity, disfigurement, physical impairments, and past and future pain and suffering. She also sought punitive damages.

Huie filed a motion for summary judgment arguing she could not be held liable for the child's alleged damages because Texas does not recognize a cause of action against a mother for causing prenatal injuries to her child. In the alternative, Huie argued that even if such a cause of action existed, her conduct would be exempted from liability under the parental immunity doctrine. The trial court granted Huie's motion without specifying the ground upon which it relied and ordered that Chenault take nothing by her claims against Huie. After the trial court granted summary judgment, Chenault withdrew her claims against the father, making the judgment final. Chenault then brought this appeal.

## DISCUSSION

■ Chenault brings three points of error generally contending the trial court erred in granting summary judgment based on either of the grounds asserted. In support of her argument that a cause of action exists against Huie, Chenault contends that Texas law recognizes claims for fetal injury and, therefore, supports imposing civil liability on a woman for conduct during pregnancy that causes injury to her later born child. We conclude otherwise. Although Texas tort law clearly supports the imposition of such liability against third parties, Texas has never extended tort liability, or applied a corresponding duty, to the unique relationship between a mother and her unborn child.

Chenault relies on the case of *Delgado v. Yandell* for the proposition that a child in Texas may bring suit against anyone for injuries sustained while *in utero*. *See Delgado v. Yandell*, 468 S.W.2d 475, 477–78 (Tex. Civ.App.—Fort Worth), *writ ref'd n.r.e per curiam*, 471 S.W.2d 569 (Tex.1971). Specifically, the court in *Delgado* held that, subject to the proof required in such cases, a cause of action exists "for prenatal injuries sustained at any prenatal stage provided the child is born alive .and survives." *Delgado*, 468 S.W.2d at 478. In *Delgado*, an automobile driven by the defendant collided with another automobile in which a pregnant woman was a passenger. Suit was brought on behalf of the later born child of the pregnant passenger alleging the child suffered permanent and disabling injuries as a result of the collision. *Id.* at 475. Under the facts of *Delgado*, the court examined only the child's right to sue third persons who engage in conduct affecting the pregnant mother and injuring the later born child. In deciding the case, the court did not analyze the ability of a child to sue its mother for conduct she directs toward herself but that unfortunately also results in injury to the child.

*Delgado* speaks in terms of the child being able to sue for the wrongful acts of "others." *Id.* at 477. It is true, both in reality and under the law, that a fetus is more than merely a part of its mother. *See id.* at 476; *see also Brown v. Shwarts*, 968 S.W.2d 331, 334 (Tex.1998). Because of the separate existence of the mother and fetus, Chenault urges us to conclude a pregnant mother falls within the category of "others" the child may sue in tort. The unique symbiotic relationship between a mother and her unborn child, however, cannot be ignored. In no other relationship is one so completely dependent

upon another for life itself. Although the law wisely no longer treats a fetus as *only* a part of the mother, the law would ignore the equally important physical realities of pregnancy if it treated the fetus as an individual entirely separate from his mother. *See Stallman v. Youngquist,* 125 Ill.2d 267, 126 Ill.Dec. 60, 531 N.E.2d 355, 358 (1988). We conclude *Delgado* and other Texas cases generally establishing tort liability do not contemplate or create a cause of action in favor of a child against its mother for prenatal injuries. Our conclusion is compelled by the unique relationship between a mother and her fetus, and, as we discuss later, the inherent differences between imposing a duty on entirely separate individuals and imposing the same duty on a person biologically joined to the injured party.

Few courts have addressed directly the issue of a woman's tort liability for prenatal conduct. Those that have done so disagree. *See Stallman v. Youngquist, supra; Grodin v. Grodin,* 102 Mich.App. 396, 301 N.W.2d 869 (1980); *Bonte v. Bonte,* 136 N.H. 286, 616 A.2d 464 (1992).

In *Grodin v. Grodin,* the court held that, because Michigan case law did not exempt the birth mother from the group of people a child may sue for prenatal injuries, the mother would bear the same liability for injurious conduct as any third party. *Grodin,* 301 N.W.2d at 870. The *Grodin* opinion offers no analysis and contains no discussion of the significant differences between imposing tort liability on third persons and imposing such liability on a pregnant woman. *Grodin's* unanalyzed summary application of third-party liability to a pregnant woman is unpersuasive.

Similarly, in *Bonte v. Bonte,* the New Hampshire Supreme Court held that, absent the protections of the parental immunity doctrine, liability for prenatal injuries would apply equally to pregnant women as to third parties. *Bonte,* 616 A.2d at 465. Once again, the opinion offers no analysis of the different positions a third-party tortfeasor and a pregnant woman hold with respect to a fetus and the impact of this difference on the imposition of a duty. *Bonte* also is unpersuasive.

We note that both *Grodin* and *Bonte* focus almost entirely on the application of the parental immunity doctrine, which when applicable prevents the imposition of liability on a parent. But application of an immunity from liability and the recognition of a legal duty that is the prerequisite to a civil cause of action are two entirely separate issues. *See* Ron Beal, *"Can I Sue Mommy?" An Analysis of a Woman's Tort Liability for Prenatal Injuries to her Child Born Alive,* 21 San Diego L.Rev. 325, 342 (1984). Immunity presupposes a legal duty and corresponding liability when the duty is breached. If a legal duty does not exist, the possible application of an immunity never becomes an issue. A court's decision whether to create a legal duty involves complex considerations of public policy including social, economic, and political questions. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993) (refusing to impose a duty on a social host who makes alcohol available to an intoxicated adult guest).

To date, the only state court to address squarely the public policy concerns raised by imposing a legal duty on a pregnant woman toward her unborn child is the Illinois Supreme Court in *Stallman v. Youngquist.* In *Stallman,* the court held that no cause of action would lie for maternal prenatal negligence because of the impossibility, as well as the undesirability, of judicially establishing a uniform standard of conduct for pregnant women. *Stallman,* 126 Ill.Dec. 60, 531 N.E.2d at 360–61. The court reasoned that judicial scrutiny of a pregnant woman's conduct would involve "an unprecedented intrusion into the privacy and autonomy" of a woman's life. *Id.* at 361. As contrasted with the isolated conduct of a third party, every act or omission by a pregnant woman during every moment of every day could have an impact on the developing fetus. *See id.* at 359. The court held that to impose a legal duty on a pregnant woman to effectuate the best possible prenatal environment for her child, as contrasted with a moral duty, would impermissibly interfere with the woman's right to control her own life. *Id.* at 360–61.

The extent of interference with a woman's legal rights that could occur as a result of

imposing a legal duty to the fetus becomes apparent when one attempts to define the nature of the duty. Defining the nature of the duty necessarily requires pinpointing when the duty arises. In one case, third-party liability to a fetus has been found based on conduct occurring many years before the child was conceived. In *Renslow v. Mennonite Hospital*, 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977), the defendants were held liable to a child for negligently transfusing the mother with incompatible blood eight years before the child was conceived. The court concluded that it was reasonably foreseeable the woman might later become pregnant, and the effects of an erroneous blood transfusion on a developing fetus were well known at the time. *Id.* at 1253.

If we apply the same legal duty to the fetus's mother as has been applied to third parties, as Chenault urges us to do, it is possible that a woman could be held liable for conduct affecting her own body that impacts her reproductive capabilities many years before her child is conceived. Arguably every woman would be obligated to maintain her body in the best possible reproductive condition so long as it was reasonably foreseeable she might bear a child at some point in the future. *See* Judith Kahn, *Of Woman's First Disobedience: Forsaking a Duty of Care to Her Fetus Is This a Mother's Crime?*, 53 BROOK. L.REV. 807, 831 (1987). Such an obligation would affect every aspect of a woman's life for many years, including her diet, her physical and sexual activity, and even her choice of work. No duty currently imposed under Texas law has such far reaching ramifications on matters involving day to day personal decisions.

Even if we were to conclude that a woman's duty to her fetus commences only upon conception, the application of a traditional tort duty is still fraught with difficulties. *See* Beal, 21 SAN DIEGO L.REV. at 364–70. In many cases, a woman may be unaware that she is pregnant for weeks or even months after conception. It is during this time that the developing fetus is most susceptible to injury. *See id.* at 365–66. Once again, a woman would be faced with the obligation to regulate her lifestyle, for potentially long

periods of time, based on the possibility that she *might* be pregnant.

Imposing a duty at the point a woman knew or should have known she was pregnant, instead of at conception, raises different but equally difficult problems. A woman's knowledge of her pregnancy may depend on varying factors such as her health, general physical condition, and emotional state. In many cases a woman may not be aware she is pregnant until long after damage to the fetus has been done. Furthermore, a woman's initial awareness of her pregnant condition may depend upon whether the pregnancy was intentional or unintentional. We perceive no justifiable reason for treating women who intended to become pregnant differently from those who did not.

Defining the nature of a duty requires not only determining when the duty arises but further necessitates setting a uniform standard of care. The application of a universal standard would affect all women of child bearing age. Yet, religious beliefs, social and economic status, age, maturity, and educational level differ significantly among women. Each of these factors may affect a woman's decisions with respect to prenatal care. Judicially created rules about prenatal conduct, such as medical care, may set a standard beyond the financial means of many women and may be offensive to the religious beliefs of others.

It has been suggested that the traditional "reasonable person" standard of care, applicable in many tort cases, could be modified to create the "reasonable pregnant woman" standard. *See* Joseph S. Badger, *Stallman v. Youngquist: "No, You Can't Sue Mommy in Illinois;" The Illinois Supreme Court Rejects Maternal Prenatal Civil Liability*, 11 N. ILL. U.L.REV. 409, 436–38 (1991). The "reasonable person" standard, however, is simply not designed to apply to matters involving intimate, private, and personal decisions. The proposed solution of a "reasonable pregnant woman" standard does not resolve many issues presented by applying a universal standard to prenatal conduct. For example, would a woman cast in the role of a "reasonable pregnant woman" be forced to

endure pain and suffering or even forego critical medical treatment because of potentially adverse effects the treatment may have on her fetus? Should a woman be forced to consider whether a jury would find her decision "reasonable" before she decides to accept or reject medical treatment? Decisions such as these involve applying inherently subjective values. Inevitably, jurors would apply their own personal views to the facts presented resulting in verdicts that would be varied and, in all probability, inconsistent and unpredictable. Cf. Anderson v. Stream, 295 N.W.2d 595, 602 (Minn.1980) (Rogsheske, J., dissenting). Inconsistent and unpredictable jury verdicts would render a "reasonable pregnant woman" standard meaningless.

In creating new legal duties, we have traditionally weighed such factors as risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. See Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex.1990). The difficulty in imposing a duty on a pregnant woman under traditional tort law becomes clear when one tries to apply this balancing test to a pregnant woman's conduct and its impact on her unborn child. For example, foreseeability and the likelihood of injury may be near certain in some instances, such as the case here. But in other instances, these two factors may be far from certain and dependent on scientific and medical knowledge not yet fully developed. And because of the unique relationship between a mother and her unborn child, and the fact that any and every action taken by a pregnant woman may have some effect on her child's growth and development, the existence of a risk created by a mother's conduct may never be clear. Moreover, in measuring the "social utility," the burden of guarding against injury, and the consequences of placing a legal burden on a pregnant woman, we are, as a jury would be, presented with questions calling for answers that are inherently value laden and, therefore, not subject to objective or convincing resolution.

To the extent a workable standard of care could be developed or the scope of conduct to which the standard is applied could be limited, it would only be through extensive research and analysis of scientific and medical data, an evaluation of broad matters of public policy, and the development of specific laws to address the concerns and needs of the citizenry. These matters are uniquely within the realm of the legislature, not the judiciary. It is the legislature's role to reflect the values of its constituents in its creation of laws.

We acknowledge that Chenault has urged us to hold simply that Huie must compensate her daughter for injuries she sustained as a result of Huie's indisputably reprehensible conduct. We further acknowledge that Huie's conduct would likely, if not unquestionably, be found unreasonable under any standard of care. As discussed above, however, the recognition of a general legal duty of care owed by a pregnant woman to her fetus, which is a necessary prerequisite to imposing any tort liability on Huie, has far broader implications than simply holding drug-abusing mothers civilly liable to their later born children. We conclude, therefore, that current law in Texas relating to negligent and grossly negligent conduct does not impose or encompass a general legal duty owed by a mother to her fetus.

In declining to recognize Chenault's cause of action, we are in no way sanctioning the conduct at issue in this case or saying that women should be able to engage in harmful acts with impunity. Criminal laws already address a person's use of illegal drugs. We seriously doubt that the imposition of tort liability based on a general legal duty would further discourage such conduct. Indeed, the threat of such civil liability may have a negative effect on fetal health. Fearing civil liability, some pregnant women may never reveal critical facts about their conduct to their physicians, resulting in less than adequate prenatal care. See Badger, 11 N. Ill. U.L.Rev. at 440–41. We should be wary of creating legal duties that possibly foster harm to unborn children.

We overrule Chenault's first and second points of error challenging the trial court's summary judgment on the issue of duty.

Because of our disposition of the first two points of error, it is unnecessary for us to address Chenault's third point of error.

We affirm the trial court's judgment.